UNITED STATES of America, Appellee,

v.

Enrique Reinaldo RIVERA and Samuel Aponte–Vega, Defendants– Appellants.

Nos. 380, 925, Dockets 93–1315, 93–1499.

United States Court of Appeals, Second Circuit.

Argued Jan. 5, 1994.

Decided April 13, 1994.

Tai H. Park, Asst. U.S. Atty., New York City (Mary Jo White, U.S. Atty. for the Southern Dist. of New York, Elizabeth M. Martinez, Alexandra Rebay, Asst. U.S. Attys., on the brief), for appellee.

Barry E. Schulman, Brooklyn, (Schulman & Laifer, on the brief), for defendant-appellant Enrique Reinaldo Rivera.

Robert M. Beecher, New York City, submitted a brief for defendant-appellant Samuel Aponte–Vega.

Before: TIMBERS, KEARSE, and LEVAL, Circuit Judges.

KEARSE, Circuit Judge:

Defendants Enrique Reinaldo Rivera and Samuel Aponte–Vega appeal from judgments entered in the United States District Court for the Southern District of New York, following a jury trial before Kevin Thomas Duffy, *Judge,* convicting each of them on one count of conspiring to distribute heroin, in violation of 21 U.S.C. § 846 (1988), and two counts of maintaining premises for the purpose of manufacturing and distributing heroin, in violation of 21 U.S.C. § 856(a)(1) (1988) and 18 U.S.C. § 2 (1988); convicting Rivera on one count of engaging in a continuing criminal enterprise, in violation of 21 U.S.C. § 848(a) (1988), and one count of possessing, as a convicted felon, a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2) (1988); and convicting Aponte–Vega on four counts of possessing and distributing heroin, in violation of 21 U.S.C. §§ 812, 841(a)(1), and 841(b)(1)(C) (1988), and 18 U.S.C. § 2, one count of using a firearm during a drug trafficking offense, in violation of 18 U.S.C. § 924(c) (1988), and one count of being a principal administrator of a continuing criminal enterprise, in violation of 21 U.S.C. §§ 848(a) and (b) (1988). Rivera was sentenced principally to life imprisonment, to be followed by ten years of supervised release, and was fined $13,250,000. Aponte–Vega was sentenced principally to life imprisonment, to be followed by an additional five years' imprisonment and then by a life term of supervised release; he was also fined $100,000. On appeal, Rivera principally challenges the admission of certain evidence at trial; Aponte–Vega principally challenges the government's summation and contends that the court impermissibly conducted a conference in his absence; and both defendants challenge aspects of sentencing. Finding no basis for reversal, we affirm the judgments.

## I. BACKGROUND

The present prosecution centered on a large-scale organization for the manufacture and distribution of heroin. The government's proof consisted chiefly of the testimony of two former members of the organization and of law enforcement officers who had made undercover purchases of heroin from

Aponte–Vega and his associates; taperecorded conversations pertaining to heroin sales; drug paraphernalia and firearms seized pursuant to search warrants; and similarly-seized drug records prepared by Rivera and Aponte–Vega documenting the manufacture, delivery, and sale of heroin. There being no sufficiency challenge, the evidence, taken in the light most favorable to the government, can be summarized briefly.

From late 1989 until his arrest in July 1991, Aponte–Vega ran an organization that distributed heroin. The organization operated heroin-cutting mills, located largely in private homes, in which pure heroin was diluted and packaged in glassine envelopes for sale on the streets at $10 per envelope. Bundles of envelopes were taken from the mills to "stash" apartments, and from there were delivered to retail distribution spots in the Bronx and Manhattan as needed.

Cooperating coconspirator Gladys Rodriguez testified that she worked for the organization from April to September 1990 and from October 1990 until she was arrested in July 1991. She worked principally at one of the mills, first as a packer, later as a boss. She testified that Aponte–Vega was her boss, and Rivera was her second boss. She provided the bulk of the direct evidence of Rivera's participation in the operation.

Rodriguez testified that in May 1990, Rivera, who was also known as "Quique," became the boss overseeing the dilution and packaging of heroin at the mill at which Rodriguez worked. In that capacity, Rivera participated in the cutting operation, supervised a crew of six to eight mill workers, and prepared records documenting the mill's productivity. In the fall of 1990, Rivera became Aponte–Vega's partner. He continued to act as an on-site mill boss through December 1990. Thereafter, until June 1991, he delegated the on-site supervisory responsibilities at his mill to Rodriguez. Rodriguez testified that Rivera nonetheless continued his general supervision, had responsibility for hiring some of the workers, and received proceeds from the business.

During the period when Rivera was acting as on-site mill boss, Rodriguez had observed him making records as to the amount of heroin being used, the amount of diluent used, and the number of envelopes filled on a given day. From January 1991 through June 1991, when Rodriguez was in charge of running the mill for Rivera, she was also responsible for keeping its payroll and productivity records. Rodriguez interpreted for the jury the organization's records introduced by the government, explaining abbreviations, column headings, and numerical entries, and interpreting the productivity and profitability calculations derived from those numbers. She testified that the records documented, *inter alia*, the amount of pure heroin used, the degree of dilution, and the number of 100–glassine–envelope bundles of diluted heroin produced on a daily basis. The productivity records indicated, for example, that during a 27–day period in May and June of 1990, Rivera's mill packaged approximately 12 kilograms of diluted heroin into 329,300 glassine envelopes having a retail value of $3,293,000, and that in October 1990, Rivera's mill packaged approximately six kilograms of diluted heroin into 160,000 glassine envelopes having a retail value of $1,600,000. The records also included daily ledgers listing the amount of heroin that each stash house received from the mills, the amount of heroin delivered to each retail distribution location, and the amount of money collected at each such location.

Aponte–Vega, along with several other members of his organization who entered pleas of guilty to various charges, was arrested in July 1991; Rivera was arrested in May 1992. Rivera and Aponte–Vega were charged with and convicted of the offenses listed above, and were sentenced as indicated. These appeals followed.

## II. DISCUSSION

On appeal, Rivera contends principally that the district court improperly allowed Rodriguez to testify to the meaning of the narcotics records and that he was denied a fair trial by the introduction of inadmissible hearsay testimony. Aponte–Vega contends principally that he was denied a fair trial by inappropriate comments during the government's summations and by the court's con-

ducting a conference in his absence. Both defendants challenge various aspects of sentencing. For the reasons below, we find no basis for reversal.

## A. Rivera's Challenge to the Testimony of Rodriguez

Rivera contends that he is entitled to a new trial on the ground that the district court improperly permitted Rodriguez to give expert testimony as to the meanings of the organization's records. He relies on cases such as *United States v. Simmons*, 923 F.2d 934, 947 (2d Cir.), *cert. denied*, 500 U.S. 919, 111 S.Ct. 2018, 114 L.Ed.2d 104 (1991); *United States v. Boissoneault*, 926 F.2d 230, 233 (2d Cir.1991); *United States v. Nersesian*, 824 F.2d 1294, 1308 (2d Cir.), *cert. denied*, 484 U.S. 957, 958, 108 S.Ct. 355, 357, 98 L.Ed.2d 380, 382 (1987); and *United States v. Brown*, 776 F.2d 397, 401 (2d Cir. 1985), *cert. denied*, 475 U.S. 1141, 106 S.Ct. 1793, 90 L.Ed.2d 339 (1986), for the proposition that Rodriguez should not have been allowed to interpret records she did not prepare. Since Rodriguez did not testify as an expert, however, Rivera's reliance is misplaced. Under the applicable principles, we see no error in the admission of her testimony.

The cases relied on by Rivera dealt with the permissible scope of testimony by law enforcement agents who testified as experts as to how certain jargon is commonly used in the drug trade. We concluded that agents who have no first-hand knowledge of the actual usage by the defendants in the case in question should not be allowed draw conclusions as to the actual meanings ascribed to those terms by those defendants. Such conclusions, we reasoned, would be based only on assessments of the probabilities that those defendants used the terms in the way they were commonly used and could encroach on the province of the jury. *See, e.g., United States v. Simmons*, 923 F.2d at 947 (inappropriate to allow "the expert [to] interpret[ ] and draw[ ] conclusions from the evidence instead of simply testifying as to the jargon of the drug trade"); *United States v. Boissoneault*, 926 F.2d at 233 (expressing "our discomfort with expert testimony in narcotics cases that not only describes the significance

of certain ... evidence in general, but also draws conclusions as to the significance of that ... evidence in the particular case").

Here, in contrast, the challenged testimony is not that of law enforcement agents testifying as experts but rather the testimony of Rodriguez who had been a member of the conspiracy. Rodriguez was never qualified at trial to testify as an expert, and to the extent that she testified to her opinions, she did so as a lay witness.

■ The admission of lay opinion testimony is governed by Federal Rule of Evidence 701. Under Rule 701, such testimony is admissible if the court concludes (1) that it is "'rationally based on' the witness's own perceptions," *United States v. Rea*, 958 F.2d 1206, 1215 (2d Cir.1992) (quoting Fed.R.Evid. 701(a)); *see United States v. Urlacher*, 979 F.2d 935, 939 (2d Cir.1992), and (2) that it will be helpful to the jury in determining a fact in issue, *see* Fed.R.Evid. 701(b); *United States v. Urlacher*, 979 F.2d at 939; *United States v. Rea*, 958 F.2d at 1215. "The rational-basis requirement 'is the familiar requirement of first-hand knowledge or observation.'" *Id.* (quoting Fed.R.Evid. 701 Advisory Committee Note). The trial court's decision to admit lay testimony will be overturned only if it constitutes an abuse of discretion. *See, e.g., Tyson v. Jones & Laughlin Steel Corp.*, 958 F.2d 756, 760 (7th Cir. 1992); *United States v. Burnette*, 698 F.2d 1038, 1051 (9th Cir.), *cert. denied*, 461 U.S. 936, 103 S.Ct. 2106, 77 L.Ed.2d 312 (1983).

■ Rivera contends that because Rodriguez did not create all of the records, she lacked first-hand knowledge of the meaning of those she did not create. We disagree. Prior to January 1991, Rodriguez had observed Rivera, at his mill, create productivity records for the organization. From January 1991 through June 1991, Rodriguez was in charge of running the mill for Rivera, under his general supervision, and she was called upon to continue the record-keeping function. Thus, though Rodriguez did not create all of the records that were introduced, her testimony showed that she had first-hand knowledge of the organization's record-keeping methods and of the terminology it used in making those records. This knowledge was

sufficient to satisfy the first requirement of Rule 701.

The second requirement of Rule 701 was also satisfied. There can be no doubt that Rodriguez's testimony concerning interpretations of the various record entries was helpful to the jury's understanding of the operations of the organization.

We conclude that the district court did not abuse its discretion in allowing her testimony in evidence under Rule 701.

**B.** *Rivera's Challenge to the Testimony of Borrego*

Rivera's other evidentiary challenge is more substantial, though ultimately it is not sufficient to warrant reversal. The government called as a witness one Walter Borrego, an informant who had tape-recorded conversations with Carlos Velez, a member of Aponte–Vega's organization, in which Borrego, on instructions from the United States Drug Enforcement Administration ("DEA"), had attempted to purchase heroin from the organization. Borrego also testified that he had attempted to obtain information from Velez in aid of a proposal that they rob Aponte–Vega. Thus, in one tape-recorded conversation, Borrego is heard asking Velez to get information from Aponte–Vega's organization but cautioning him to do so without asking direct questions: "you can't ask anything because they can figure it," and "you know, if you ask any question, you know, it could, they're gonna ... they could suspect...." (GX 105.) Asked at trial to what he had been referring, Borrego stated that he

> had been trying to drill into Carlos' mind to get me all the addresses and places where material and money was kept in order to rip him off.
>
> Q. Rip who off?
> A. Sammy's connection.
> Q. Whose plan was it to rip off Sammy's connection?
> A. Mine.
> Q. Why did you propose that plan to Carlos Velez?
> A. What I wanted to know is where all the places were.

(Trial Transcript ("Tr.") 650–51.) The government later proceeded to bring out that Velez had mentioned the name "Quique" in connection with one of Aponte–Vega's stash houses:

> Q. Mr. Borrego, during the time that you were working with the DEA, did you ever hear the name Quique?
> MR. SCHULMAN [Rivera's counsel]: Objection.
> THE COURT: I'll permit that.
> A. Yes.
> Q. Under what circumstances?
> A. When I was trying to get information out of Carlos with respect to the places where the heroin was kept, Carlos told me one day that Sammy had a partner in Queens, and that he believed that that was the place where the pure heroin was kept....
> Q. Who did Carlos Velez say was Sammy Aponte–Vega's partner?
> A. He mentioned the name Quique.
> Q. Did you ever find out Quique's true name?
> A. No.
> Q. Did you ever see the man that Carlos called Quique?
> A. No.

(*Id.* 669–70.)

Rivera, one of whose nicknames was "Quique," contends that Velez's testimony that Aponte–Vega had a partner named "Quique" who had a stash house was inadmissible hearsay. The government contends that (a) the statements were nonhearsay because they were statements of a coconspirator, and (b) even if they were hearsay, the admission of the statements was harmless. We agree only with the government's latter contention.

Under Fed.R.Evid. 801(d)(2)(E), an out-of-court statement is nonhearsay if it was made by a coconspirator in furtherance of the conspiracy. In order to admit a statement under this Rule, the court must find (1) that there was a conspiracy, (2) that its members included the declarant and the party against whom the statement is offered, and (3) that the statement was made both (a)

during the course of and (b) in furtherance of the conspiracy. *See Bourjaily v. United States,* 483 U.S. 171, 175, 107 S.Ct. 2775, 2778–79, 97 L.Ed.2d 144 (1987); *United States v. Tracy,* 12 F.3d 1186, 1196 (2d Cir. 1993); *see also United States v. Mastropieri,* 685 F.2d 776, 786 (2d Cir.) (declarations of one member of a conspiracy are admissible against another member "only if made 'during the course of and in furtherance of the conspiracy'" (quoting Rule)), *cert. denied,* 459 U.S. 945, 103 S.Ct. 260, 74 L.Ed.2d 203 (1982). To be "in furtherance" of a conspiracy, the statements must in some way have been designed to promote or facilitate achievement of the goals of that conspiracy, as by, for example, providing information or reassurance to a coconspirator, seeking assistance from a coconspirator, or by communicating with a person who is not a member of the conspiracy in a way that is designed to help the coconspirators to achieve the conspiracy's goals. *See, e.g., United States v. Tracy,* 12 F.3d at 1196; *United States v. Maldonado–Rivera,* 922 F.2d 934, 958 (2d Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 2858, 115 L.Ed.2d 1026 (1991); *United States v. Rahme,* 813 F.2d 31, 35–36 (2d Cir.1987).

▪ The erroneous admission of hearsay testimony is subject to harmless error analysis. *See, e.g., United States v. Harwood,* 998 F.2d 91, 99 (2d Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 456, 126 L.Ed.2d 388 (1993). Such an error will not form the basis for reversal "if the appellate court can conclude with fair assurance that the evidence did not substantially influence the jury." *United States v. Rea,* 958 F.2d at 1220; *see also Kotteakos v. United States,* 328 U.S. 750, 764–65, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946).

▪ We cannot conclude on the present record that Velez's statement to Borrego was in furtherance of a conspiracy of which Rivera was a member, for the record clearly indicates, and the government concedes, that Velez mentioned that "Quique" was a partner of Aponte–Vega and had a stash house in Queens only in the context of Borrego's attempt to identify targets within Aponte–Vega's organization that Borrego and Velez

might be able to rob. We cannot accept the government's suggestion that statements elicited to facilitate the planning of a robbery of a stash house allegedly owned by Rivera were in furtherance of the conspiracy of which Rivera was a member. Accordingly, the statements were not within the scope of Rule 801(d)(2)(E). They were hearsay, and we see no ground on which they were admissible.

▪ Nonetheless, we conclude that the error in admitting the statements was harmless, for their damaging effect was slight and the other evidence of Rivera's membership in the Aponte–Vega organization was abundant. Rodriguez testified that in May 1990, Rivera took over responsibility for the day-to-day operations of the mill at which Rodriguez worked. She testified that Rivera participated "in working with the heroin, putting the heroin into packages" (Tr. 796.); that he had overall responsibility "to make sure everything was done right" (*id.*); that he had responsibility for keeping the productivity records that tracked on a daily basis the heroin used, cut, and packaged; and that she observed Rivera make those records. Aponte–Vega was her boss, and Rivera was her "second boss." And though Rivera maintained that Rodriguez had fabricated her testimony as to his involvement in the organization, her testimony was corroborated by expert testimony that a number of the organization's records were in Rivera's handwriting.

Against the wealth of detailed evidence as to Rivera's participation in the organization, the hearsay statements associating an otherwise unidentified person named "Quique" with Aponte–Vega and one of his stash houses were inconsequential. We are convinced that the challenged evidence did not substantially influence the jury and that the error was therefore harmless.

*C. Aponte–Vega's Challenges to the Government's Summation*

Aponte–Vega contends principally that he is entitled to a new trial because he was prejudiced by parts of the government's summations that (a) repeatedly referred to his

organization as the "company," and (b) vouched for the credibility of Rodriguez. Neither of these contentions has merit.

### 1. References to the "Company"

 A prosecutor's statements during summation, if improper, will result in a denial of due process rights only if, in the context of the entire summation, they cause the defendant substantial prejudice. *See, e.g., United States v. Casamento,* 887 F.2d 1141, 1189 (2d Cir.1989), *cert. denied,* 493 U.S. 1081, 110 S.Ct. 1138, 107 L.Ed.2d 1043 (1990); *United States v. Tutino,* 883 F.2d 1125, 1136 (2d Cir.1989), *cert. denied,* 493 U.S. 1081, 110 S.Ct. 1139, 107 L.Ed.2d 1044 (1990). The determination of whether there was such prejudice depends largely on an analysis of the severity of the misconduct, the curative measures taken by the court, and the certainty of conviction absent the misconduct. *See, e.g., Blissett v. Lefevre,* 924 F.2d 434, 440 (2d Cir.), *cert. denied,* — U.S. —, 112 S.Ct. 158, 116 L.Ed.2d 123 (1991); *United States v. Tutino,* 883 F.2d at 1136. If the defendant failed to make timely objection to a statement contained in the prosecutor's summation, the statement will not be deemed a ground for reversal unless it amounts to a "flagrant abuse." *United States v. Ortiz,* 857 F.2d 900, 904 (2d Cir.1988), *cert. denied,* 489 U.S. 1070, 109 S.Ct. 1352, 103 L.Ed.2d 820 (1989); *see United States v. Perez,* 702 F.2d 33, 37 (2d Cir.), *cert. denied,* 462 U.S. 1108, 103 S.Ct. 2457, 77 L.Ed.2d 1336 (1983).

 Aponte–Vega contends that since he was charged with running a continuing criminal enterprise, the repeated use by the Assistant United States Attorney ("AUSA") of the term "company" when referring to the organization run by Aponte–Vega and Rivera was tantamount to unsworn testimony by the AUSA that such an organization existed. Notwithstanding Aponte–Vega's contention that the AUSA used the word "company" more than 75 times in her summation, Aponte–Vega made no objection at trial.

We cannot conclude that the AUSA's use of the term "company" was impermissible, much less a "flagrant abuse" warranting reversal in the absence of any objection at trial, for that term was used by one coconspirator witness, and the other coconspirator witness testified in analogous terms. Victor Alvarez, a bookkeeper in the organization, introduced the term, stating that "[a]fter I was arrested, well, my family bailed me out and the company paid for my lawyer." (Tr. 440.) Alvarez explained that by "company," he meant the "suppliers" of the drugs, *i.e.,* Aponte–Vega. (*Id.* 451.) He thereafter repeatedly referred to the Aponte–Vega organization as "the company." (*E.g., id.* 459, 464, 467, 468.) Further, Rodriguez, while not using the term "company," described the organization's operations in a way that made it clear that it was run as a business. For example, she testified that she worked for Aponte–Vega in the "heroin business" (*id.* 748); that Aponte–Vega "g[o]t a job for me" (*id.* 765); and that at one point she had been "laid off" (*id.* 780), or "fired" due to "[l]ack of work" (*id.* 819). She described payroll records that were kept showing employee salaries and vacations; she testified to the organization's six-day work week, the holidays allowed, and the policy of giving employees bonuses for certain holidays; and she explained its absenteeism policy: "[i]f they miss one day without notifying the day before, it's possible that they lose their position or their jobs" (*id.* 828–29). Given the testimony of Alvarez and Rodriguez, it is plain that neither the concept nor the characterization of the organization as a company originated with the AUSA, and there was little risk that the jury would interpret the summation references to "company" as testimony of the AUSA. We see no error, much less plain error.

### 2. The "Vouching" for Rodriguez

 We have repeatedly warned prosecutors that they should avoid interjecting their personal beliefs into their summations, *United States v. Nersesian,* 824 F.2d at 1328, or "vouch[ing] for their witnesses' truthfulness," *United States v. Modica,* 663 F.2d 1173, 1179 (2d Cir.1981), *cert. denied,* 456 U.S. 989, 102 S.Ct. 2269, 73 L.Ed.2d 1284 (1982). Though the occasional use of rhetorical devices may be fair argument, we have emphasized that prosecutors should avoid "frequent[ ] use [of] rhetorical statements punctuated with excessive use of the personal pronoun 'I'," *United*

*States v. Nersesian,* 824 F.2d at 1328, in phrases such as " 'I think it is clear,' " or " 'Does it make sense—I think it does,' " *id.* at 1328, or " 'I'm here to tell you that Mr. Amato's testimony ... is truthful,' " *United States v. Modica,* 663 F.2d at 1178. Such phrasing is inappropriate because the prosecution tends to "ma[ke] an issue of [its] own credibility," *United States v. Rivera,* 971 F.2d 876, 884 (2d Cir.1992) (quoting *United States v. Drummond,* 481 F.2d 62, 64 (2d Cir.1973)), or to "impl[y] the existence of extraneous proof," *United States v. Bagaric,* 706 F.2d 42, 61 (2d Cir.), *cert. denied,* 464 U.S. 840, 104 S.Ct. 133, 78 L.Ed.2d 128 (1983). Nonetheless, we must evaluate the challenged remarks in the context of the trial as a whole, for the government is allowed to respond to argument that impugns its integrity or the integrity of its case. *Id.* at 60–61. Thus, when the defense has "attacked the prosecutor's credibility or the credibility of the government agents, the prosecutor is entitled to reply with 'rebutting language suitable to the occasion.' " *United States v. Praetorius,* 622 F.2d 1054, 1060–61 (2d Cir. 1979) (quoting *United States v. LaSorsa,* 480 F.2d 522, 526 (2d Cir.), *cert. denied,* 414 U.S. 855, 94 S.Ct. 157, 38 L.Ed.2d 105 (1973)), *cert. denied,* 449 U.S. 860, 101 S.Ct. 162, 66 L.Ed.2d 76 (1980).

■ In the present case, Rivera's summation repeatedly accused the government of having fabricated Rodriguez's testimony. For example, Rivera's counsel argued that

> [w]hen she testified she was scripted ... like in all good plays I should say there has got to be a little bit of a prompt....
>
> Why do you need and ask the prosecutor this, why do you need to see an individual a hundred to two hundred times in your office? What could you possibly say in all that time that you're not going to alter?

(Tr. 1410–11.) Counsel also suggested that the government had not called Rodriguez as a grand jury witness because it did not like the way her testimony would have emerged at that time and needed time to have it changed.

In response to these attacks, the AUSA urged the jury to believe Rodriguez, arguing, for example, that "she was not playing a game up there, ladies and gentlemen.... She did whatever she could to tell the truth" (*id.* 1439); that "[s]he had the demeanor of a person who told the truth" (*id.* 1441); and that "[s]he got up there and told the truth. I submit to you that is the interpretation of what Gladys Rodriguez did, and that is the correct one" (*id.* 1442). In light of the defense summation, the government's rebuttal was not impermissible.

## D. *Aponte–Vega's Absence from the Charging Conference*

■ Aponte–Vega also contends that he is entitled to a new trial because the district court failed to provide for his presence at the conference at which the court and counsel discussed what instructions would be given to the jury. We find no error.

Due process requires that a defendant be present at all stages of the trial "to the extent that a fair and just hearing would be thwarted by his absence." *United States v. Fontanez,* 878 F.2d 33, 35 (2d Cir.1989) (internal quotes omitted). This requirement has been codified in Fed.R.Crim.P. 43, *see United States v. Reiter,* 897 F.2d 639, 642 (2d Cir.) ("rule 43 encompasses the protections afforded by the sixth amendment confrontation clause, the due process clause of the fifth amendment, and the common law right of presence"), *cert. denied,* 498 U.S. 817, 111 S.Ct. 59, 112 L.Ed.2d 34 (1990), which provides in pertinent part as follows:

> (a) **Presence Required.** The defendant shall be present at the arraignment, at the time of the plea, at every stage of the trial including the impaneling of the jury and the return of the verdict, and at the imposition of sentence, except as otherwise provided by this rule....
>
> ....
>
> (c) **Presence Not Required.** A defendant need not be present in the following situations:
>
> ....
>
> (3) At a conference or argument upon a question of law.

Fed.R.Crim.P. 43(a), (c).

The content of the instructions to be given to the jury is purely a legal matter, *see, e.g.,*

*United States v. Graves,* 669 F.2d 964, 972 (5th Cir.1982), and a conference to discuss those instructions is thus a conference on a question of law at which a defendant need not be present, *see, e.g., United States v. Switzer,* 252 F.2d 139, 145 (2d Cir.), *cert. denied,* 357 U.S. 922, 78 S.Ct. 1363, 2 L.Ed.2d 1366 (1958); *United States v. Sherman,* 821 F.2d 1337, 1339 (9th Cir.1987); *United States v. Graves,* 669 F.2d at 972; *United States v. Gregorio,* 497 F.2d 1253, 1259–60 (4th Cir.), *cert. denied,* 419 U.S. 1024, 95 S.Ct. 501, 42 L.Ed.2d 298 (1974).

Accordingly, the district court did not violate Aponte–Vega's rights by proceeding with the charging conference in his absence.

### E. *Sentencing Contentions*

#### 1. Rivera

■ Rivera contends that he is entitled to be resentenced because the district court (1) erred in finding that more than 100 kilograms of heroin were attributable to him, and (2) improperly denied his attorney an opportunity to be heard prior to sentencing. These contentions need not detain us long.

The presentence report ("PSR") prepared on Rivera determined that the quantity of heroin attributable to him in connection with the organization's activities was 100–300 kilograms. With this determination, and with the other adjustments required by the federal Sentencing Guidelines ("Guidelines"), the Guidelines prescribed a sentence of life imprisonment. Rivera contested the PSR's quantity determination, contending that he was responsible for only 30–100 kilograms. If his contention were upheld, the prescribed range of imprisonment would have been 360 months to life. The district court found that the government had well documented the evidence supporting a conclusion that more than 100 kilograms of heroin were attributable to Rivera, that Rivera had failed to cite to any evidence to support his request for a finding of a smaller quantity, and that, even if the court accepted Rivera's contention, it would make no difference in the sentence imposed:

I will make a finding that upon the record as I see it, massive amounts were being dealt that this man was responsible for. That's number one.

Number two, I will make a finding that the record can be read appropriately to say that the massive amounts come over 100 kilos.

Even if it were under 100 kilos I can tell you the result would be the same.

(Rivera Sentencing Transcript at 10.)

On appeal, Rivera again contends that he was not responsible for more than 30–100 kilograms. Though our review of the record persuades us that a preponderance of the evidence supported the district court's finding that 100–300 kilograms of heroin were attributable to Rivera, we need not even reach this issue because the district court indicated that it would have sentenced Rivera to life imprisonment even if he were responsible only for the quantity he conceded.

Where the Guidelines provide overlapping ranges of imprisonment, and the sentence actually imposed is in the area of overlap and the sentencing court has indicated that it would have imposed the same sentence whichever range applied, there is no basis for reversal on appeal. *See, e.g., United States v. Garcia,* 936 F.2d 648, 656 (2d Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 595, 116 L.Ed.2d 619 (1991); *United States v. Bermingham,* 855 F.2d 925, 934–35 (2d Cir.1988). Here, the Guidelines' recommended imprisonment range for Rivera if he were responsible for 30–100 kilograms of heroin, as he contended, would have been 360 months to life. Since the court sentenced him to life imprisonment, as prescribed for one in his position who was responsible for more than 100 kilograms, and stated that the sentence would have been the same even assuming the lesser quantity, the sentence imposed by the district court was within the area of overlap and must be affirmed.

Rivera's further contention that the district court denied him an opportunity to be heard in connection with sentencing, in violation of Fed.R.Crim.P. 32(a)(1) ("[b]efore imposing sentence, the court shall ... afford counsel an opportunity to speak on behalf of the defendant"), is frivolous. The record shows that the district court gave Rivera's

counsel an opportunity to speak and that counsel did so at length. The court also asked Rivera whether he wished to speak before it imposed a sentence. The court pronounced sentence only after Rivera's attorney had concluded his plea for lenience and Rivera had declined to speak.

### 2. Aponte–Vega

■ Aponte–Vega argues that the district court erred in imposing on him a $100,000 fine despite his representations that he had no money to pay the fine. We disagree.

Guidelines § 5E1.2(a) provides that the "court shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine." *Id.* § 5E1.2(a). The defendant bears the burden of showing that he is unable to pay the fine. *See United States v. Marquez,* 941 F.2d 60, 66 (2d Cir.1991). He "can satisfy this burden by an independent showing, or by reference to his presentence report." *United States v. Rivera,* 971 F.2d 876, 895 (2d Cir.1992). The sentencing court may not base the imposition of a fine on its mere suspicion that the defendant has funds. *See, e.g., United States v. Stevens,* 985 F.2d 1175, 1188 (2d Cir.1993) (imposition of fine vacated where counsel had been appointed to represent defendant because of indigence, PSR had concluded that defendant had no ability to pay, and court simply speculated that defendant could pay); *United States v. Rivera,* 971 F.2d at 895 (same where PSR concluded that defendant appeared to lack ability to pay and government offered no proof to the contrary); *United States v. Seminole,* 882 F.2d 441, 444 (9th Cir.1989) (same where PSR "confirmed that [defendant] was indigent and recommended against the imposition of a fine"). The court, however, is "surely not required to accept uncritically a representation" by the defendant that he has no assets. *United States v. Marquez,* 941 F.2d at 66.

In the present case, the PSR prepared on Aponte–Vega stated, in pertinent part, that Aponte–Vega

> reported that he has forfeited all of his cash and property to the Government. The defendant stated that the house locat-

ed ... [in] Florida is in his wife's name and had a value of approximately $65,000 but was destroyed during the hurricane disaster this year forcing his wife and children to reside with relatives in Kendall, Florida. The defendant did not submit any additional financial information.

The PSR did not, however, conclude that Aponte–Vega lacked the ability to pay a fine.

Nor did Aponte–Vega submit evidence of indigence thereafter. Indeed, at the sentencing hearing, he stated, through his court-appointed attorney, that he "wishe[d] to *retain* counsel for this sentencing and for the appeal." (Aponte–Vega Sentencing Transcript at 2 (emphasis added).) While ultimately counsel was not retained, the fact that Aponte–Vega was contemplating such a move suggested that he was not without assets.

At sentencing, the district court ruled that Aponte–Vega had failed to show his inability to pay any fine, stating as follows:

> The statute also calls for a potential fine, it says from $25,000 to $4 million. My understanding is that most of your ill-gotten goods have now been forfeited to the government in connection with their forfeiture program. I will impose a fine of $100,000 just in case anything is left over.

(*Id.* 6.) The possibility that there might be "[some]thing ... left over" was not mere speculation, given the indication that Aponte–Vega had sufficient assets to consider hiring an attorney of his own choosing.

There being no evidence of indigence other than Aponte–Vega's own self-serving statements that he was without assets, we cannot say that the court erred in rejecting those statements.

### CONCLUSION

We have considered all of defendants' arguments on appeal and have found in them no basis for reversal. The judgments of conviction are affirmed.