99-1344-cr(L)
USA v. Spinelli

**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

August Term, 2007

(Argued: April 14, 2008                    Decided: December 31, 2008)

Docket Nos  99-1344-cr(L), 99-1394-cr(XAP)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA,

*Appellee*,

v.

ROBERT SPINELLI,

*Defendant*,

MICHAEL SPINELLI,

*Defendant-Appellant*.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Before: LEVAL, WESLEY, LIVINGSTON, *Circuit Judges*.

Appeal by the defendant Michael Spinelli from his conviction following a jury trial in the United States District Court for the Eastern District of New York (Dearie, *J.*) for, *inter alia*, conspiracy to commit murder and assault with a dangerous weapon, both for the purpose of increasing and maintaining a position in a racketeering enterprise, witness tampering, and use of a

firearm in the commission of a crime of violence. Defendant contends primarily that he is entitled to a new trial because of the Government's failure to disclose impeachment material and because of the prosecutor's improper vouching for the credibility of government witnesses on the rebuttal summation. The Court of Appeals (Leval, J.) affirms the conviction. Although the prosecutor improperly vouched to the jury that the government's cooperating accomplices had never perjured themselves or falsely implicated anybody in a crime, the error does not warrant vacating the conviction in light of the strength of the evidence of guilt. With the consent of the government, the court remands for reconsideration of the sentence.

JO ANN M. NAVICKAS, Assistant United States Attorney for the Eastern District of New York (David C. James, Assistant United States Attorney, and Benton J. Campbell, United States Attorney, on the brief), for *Appellee*.

EPHRAIM SAVITT, New York, New York for *Appellant*.

LEVAL, *Circuit Judge*:

Defendant Michael Spinelli appeals from his conviction following a jury trial in the United States District Court for the Eastern District of New York (Dearie, *J.*) for conspiracy to commit murder for the purpose of increasing and maintaining a position in a racketeering enterprise (the Luchese Organized Crime Family), 18 U.S.C. § 1959(a)(5); assault with a dangerous weapon for the purpose of increasing and maintaining a position in a racketeering enterprise, 18 U.S.C. § 1959(a)(6); conspiracy to tamper with a witness, 18 U.S.C. § 371; witness tampering, 18 U.S.C. § 1512(a)(1)(A); and using a firearm during and in relation to the murder conspiracy and the assault (two counts), 18 U.S.C. § 924(c)(1)(A). He was sentenced principally to 295 months imprisonment to begin on completion of a twenty-two year term he was already serving, plus a single 60-month consecutive term on the firearm counts.

Spinelli contends on appeal that he is entitled to a new trial because the government (1) failed to disclose information helpful to the defense, as required by *Brady v. Maryland*, 373 U.S. 83 (1963) and *Giglio v. United States*, 405 U.S. 150 (1972); (2) knowingly used perjured testimony, and (3) committed various misconduct at trial.  He contends also that his sentence should be reconsidered in light of *United States v. Booker*, 543 U.S.220 (2005), and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005); and that the court erred in increasing his sentencing level under § 2A2.1(b)(1) of the United States Sentencing Guidelines ("U.S.S.G.") by reason of the victim's injuries, without adequate findings.

**BACKGROUND**

**A. The Attempted Murder of Capozzalo**

The evidence, seen in the light most favorable to the government, see *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979), showed the following.  The series of events that ended in Spinelli's conviction for the attempted murder of Patricia Capozzalo began with a self-fulfilling mistake.  Members of the Luchese crime family incorrectly suspected Peter Chiodo, a captain and long-time member of the family, of cooperating with the government.  They therefore plotted to kill him.  On May 8, 1991, Chiodo was shot thirteen times but survived.  After the attempt on his life, Chiodo was informed by intermediaries that members of the Luchese family would kill his entire family if he cooperated with the government.  In the face of these events, Chiodo decided to cooperate with the government.  His family was relocated with the exception of his sister, Patricia Capozzalo, who refused to move.

Chiodo agreed with the government that he would testify against several organized crime

3

members including Vic Amuso, the boss of the Luchese family. To intimidate Chiodo so that he would not testify, members of the Luchese family decided to murder his sister. The "hit" on Capozzalo was approved by Amuso and was to be carried out by Richard Pagliarulo, who had taken over Chiodo's role as captain of a crew. Pagliarulo's crew included the defendant Spinelli, his brother Robert, and Dino Basciano. Pagliarulo put Spinelli in charge of planning the murder. Spinelli assigned Basciano to be the shooter.

On March 10, 1992, Spinelli, Basciano, and the rest of the hit team waited for Capozzalo near her house. As Capozzalo was parking her car, Spinelli blocked her car with his van. Basciano walked up to her and fired at her through the driver's window. While he was shooting, his gun fell apart. Capozzalo was hit in the ear and the back. According to her testimony several bullets came so close that she could "feel a breeze." She survived and was then relocated by the government.

Spinelli was later arrested on charges unrelated to the attempt on Capozzalo. In prison, he associated with Frank Gioia, a member of the Luchese crime family, who later became a witness for the government and testified against Spinelli. Spinelli complained to Gioia that his contributions to the attempt on Capozzalo were not properly appreciated, given that he had not been inducted into the Luchese family and was not reimbursed for his expenses. Shortly after he complained to Gioia, he was inducted into the Luchese family. Later, in January 1994, the defendant spoke again to Gioia in prison about his role in the attempt to kill Capozzalo. According to Gioia's testimony, Spinelli complained that he wanted to plead guilty to the attempted murder, but the Luchese family would not allow it.

**B. Spinelli's Trial**

4

At the trial, the government presented the testimony of several associates of Spinelli, including Basciano and Gioia. Basciano testified in detail about the murder conspiracy, explaining that Spinelli recruited him together with Spinelli's brother Robert, and two other Luchese "soldiers" to kill Capozzalo. Spinelli provided details of how the hit team prepared to kill Capozzalo, which included learning her daily routine, testing a gun, and aborting two attempts. On cross-examination, Basciano admitted that he had a history of violent crime and had been involved in other murder plots. Gioia testified to what Spinelli had told him when they were in prison together, which corroborated Basciano's testimony. On cross, Gioia was extensively impeached by bringing out his involvement on behalf of the Luchese family, in murder, attempted murder, drug trafficking and other crimes, as well as by his lies to federal agents during the course of his cooperation.

Spinelli testified and asserted in his defense that in 1993 he refused the government's offer of an advantageous plea agreement with no additional prison time because he was innocent. The government's theory was that Spinelli refused the offer because the Luchese family would not permit him to plead guilty to the family-sponsored attempt on Capozzalo.

In support of its theory, the government cross-examined Spinelli on his affiliation with the Luchese family. Spinelli refused to testify about the Luchese family, or even use its name, contending he was shielded by the Fifth Amendment from answering questions about organized crime. The district judge had set up a procedure designed to allow Spinelli to invoke the Fifth Amendment out of the presence of the jury. Nonetheless, in many instances, Spinelli disregarded the procedure and refused to answer questions in the jury's presence.

As noted, the jury found Spinelli guilty on all counts.

**C. Post-Trial Events**

Spinelli initially filed notice of appeal in June, 1999. He was then notified by the Assistant United States Attorney (AUSA) who had prosecuted his case that, prior to Spinelli's trial, Gioia had violated the terms of his cooperation agreement. The AUSA's notification stated that the prosecutors had learned of Gioia's violations from Gioia's testimony in a later unrelated state court trial, which revealed that for two years after he began cooperating with federal authorities, Gioia concealed from the federal authorities that his former fianceé's relatives were involved in several crimes, including the murder of a New York City police officer. Acknowledging that this information should have been disclosed to Spinelli's counsel under *Brady* and *Giglio*, the government agreed to allow Spinelli to withdraw his appeal without prejudice so that he could pursue further action in the district court.

On July 12, 2000, Spinelli filed a motion under Fed R. Crim. P. 33 for a new trial based on the newly disclosed evidence. The district court held a hearing and denied his motion. Spinelli then reinstituted his appeal.

**DISCUSSION**

Spinelli contends he is entitled to a new trial, because the prosecution (1) impermissibly withheld information about Gioia, which it was obligated to give him under *Brady* and *Giglio*; (2) presented perjured testimony; and (3) committed other misconduct at trial. In addition he argues that the court erred in imposing an increase under U.S.S.G. § 2A2.1(b)(1), to his Guidelines sentence level, and that in any event, we should remand for reconsideration of the sentence to give effect to *United States v. Booker*, 543 U.S. 220 (2005).

**I. Violation of *Brady/Giglio* and Use of Perjury**

We review a district court's decision to deny a Rule 33 motion seeking a new trial for abuse of discretion. *United States v. Wong*, 78 F.3d 73, 78 (2d Cir. 1996). The government does not dispute that Gioia breached his plea agreement by withholding information, or that his breaches and related impeachment material were not disclosed to Spinelli for use at trial. The government nonetheless disputes Spinelli's entitlement to a new trial.

**A. The Materiality Standard**

Under *Brady* and *Giglio,* the government's failure to disclose favorable information will result in an order of retrial if the undisclosed information is "material," within the exacting standard of materiality established by the governing case law.

While prosecutors have a constitutional duty under *Brady* and *Giglio* to disclose to the defense for use at trial helpful information, including information which impeaches government witnesses, see *Giglio*, 405 U.S. at 153-55, such undisclosed information is deemed material so as to justify a retrial only "if there is a reasonable probability that, had [it] been disclosed to the defense, the result of the proceeding would have been different." *Kyles v. Whitley*, 514 U.S. 419, 433-34 (1995). A reasonable probability of a different result is shown when the government's failure to disclose "undermines confidence in the outcome of the trial." *Id.* at 434 (quoting *United States v. Bagley*, 473 U.S. 667, 678 (1985)).

Spinelli contends he was entitled to receive not only the information described above about the involvement of Gioia's former fiancée's relatives in various crimes, but also about Gioia's agreement (until permission was denied by the Luchese family) to help Frank Smith, the

7

brother of Gioia's ex-fianceé, to kill Joe Izzo, who Smith believed had murdered Smith's father. At the trial, when asked whether he and Smith committed crimes together, Gioia answered, "I never knew Frank Smith on the street, no."

The materiality of undisclosed information which could have served to impeach a government witness is affected by the importance of the witness's testimony, as well as the importance of the disclosed information to the impeachment of the witness. Impeaching information is more likely to be deemed material "if the witness whose testimony is attacked supplied the only evidence linking the defendant[] to the crime." *Wong*, 78 F.3d at 79 (internal quotations omitted). Impeaching information is less likely to be considered material when it "merely furnishes an additional basis on which to impeach a witness whose credibility has already been shown to be questionable." *United States v. Payne*, 63 F.3d 1200, 1210 (2d Cir. 1995). That is, if the information withheld is merely cumulative of equally impeaching evidence introduced at trial, so that it would not have materially increased the jury's likelihood of discrediting the witness, it is not material. *United States v. Avellino*, 136 F.3d 249, 257 (2d Cir. 1998).

Under this stringent materiality standard, Spinelli is not entitled to a new trial. The defense attacked Gioia on cross-examination, effectively revealing to the jury his extensive criminal history and effectively undermining his credibility. The defense highlighted his participation in murder, attempted murder, drug trafficking, gun trafficking, and extortion.

Spinelli's counsel also elicited that Gioia lied to federal agents even after he entered into the cooperation agreement. Gioia admitted that during the course of his cooperation he lied to an

FBI agent about an incident in which he assaulted another inmate. Only after he became aware that his lie could have serious negative consequences with respect to his cooperation agreement did he reveal the lie. Additional impeachment by showing additional lies would have made little or no difference.

Further, Gioia's testimony, although damaging to Spinelli, was merely confirmatory of Basciano's eyewitness, co-conspirator account, which was the main evidence linking Spinelli to the crime. As the admitted gunman, Basciano detailed Spinelli's involvement in the crime and explained the motivation for the attempted murder of Capozzalo. Gioia's testimony was merely secondary corroboration of what Basciano told the jury. Finally, the information of which the defense was deprived in no way contradicted Gioia's testimony about Spinelli's role in the murder attempt.

We conclude that, against the very convincing background of the impeachment of Gioia that was revealed to the jury at trial, the additional potential for impeachment from the information that was not revealed would have added no meaningful likelihood of discrediting Gioia's testimony in the jury's eyes, much less of leading the jury to doubt Basciano's testimony. In sum, there is no reasonable probability that the outcome of the trial would have been different had the government disclosed the information. The government's failure to disclose this information does not warrant ordering a new trial.

**B. The Materiality Standard for Use of Perjury**

Spinelli argues that even if he cannot satisfy the *Brady* and *Giglio* materiality standard, his case satisfies the lower standard that applies in cases where a conviction is obtained by the

9

prosecution's knowing use of perjured testimony. Spinelli claims that the prosecutors knew about Gioia's breach of his cooperation agreement and either instructed Gioia not to reveal the breach at trial or in any event knew he was lying when he testified.

In deciding whether a new trial is required due to the prosecutor's knowing introduction of perjured testimony, the appropriate inquiry depends on the "materiality of the perjury to the jury's verdict and the extent to which the prosecution was aware of the perjury." *United States v. Wallach*, 935 F.2d 445, 456 (2d Cir. 1991). This standard of materiality, as Spinelli correctly argues, is less exacting than in the case of a prosecutor's failure to perform *Brady* or *Giglio* obligations. If the prosecution knew of the perjury, then the conviction must be vacated "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Id.*; *see also Wong*, 78 F.3d at 81-82.

The district court denied Spinelli's motion based on its conclusion that the government prosecutors did not know of Gioia's perjury. This finding, however, rested on the prosecutors' sworn affidavits, which were never tested by cross examination because the district court denied Spinelli's motion without an evidentiary hearing. Because the defendant had no opportunity to challenge the prosecutors' statements, we cannot affirm on the basis of that finding. *Cf. United States v. Hamilton*, 538 F.3d 162, 168 (2d Cir. 2008) (holding, in the context of a suppression motion, that if asserted facts are contested, the court must hold a hearing to determine the contested issues).

Even if we were to assume, despite the prosecutors' contrary affidavits, that they did know Gioia was testifying perjuriously, the reduced materiality standard described in *Wallach*

was not met. As described above, Gioia was shown to be a professional criminal, a member of a vicious organized crime family who engaged in murder, extortion, and trafficking in contraband, not to mention lying. The additional potential for impeachment of Gioia would in the circumstances have raised no reasonable likelihood of affecting the jury's verdict. *See Wong* 78 F.3d at 82 (where the court assumed that the government knowingly used perjured testimony, materiality standard was not met because ample other evidence supported the conviction and the evidence of perjury would have been cumulative of other significant impeachment of the witness.)

**II. Other Alleged Government Misconduct**

Spinelli contends he is entitled to a new trial because the government committed misconduct, first, by asking him questions on cross examination about the Luchese family and about his brother Robert to which it knew that he would exercise his Fifth Amendment right, and second, by improper comments on summation.

**A. Fifth Amendment**

By taking the witness stand in his defense, a defendant does not give up his right under the Fifth Amendment to refuse to answer *all* questions. *See Rogers v. United States*, 340 U.S. 367, 371 (1951). By choosing to testify, however, the defendant gives up his right to refuse to answer questions that fall within the proper scope of cross examination. *Id.* at 373. As the Supreme Court explained, a witness may not pick and choose what aspects of a subject to discuss; if allowed to draw the boundaries of his testimony anyplace he chooses, the defendant would be able to distort the facts. *Mitchell v. United States*, 526 U.S. 314, 321-22 (1999). Thus,

11

when a defendant takes the stand in his defense, he surrenders his Fifth Amendment privilege for proper cross-examination but not for questions which go outside the bounds of proper cross-examination.

Spinelli testified in his defense. On direct examination he testified that he had pled guilty twice previously to murders, conspiracies to commit murder, extortion, and racketeering. The relevance of his prior guilty pleas was as support for the contention that he was disposed to confess to crimes he committed. On the other hand, according to his testimony, he had refused an opportunity offered to him to plead guilty to the attempted murder of Capozzalo without any increase in his sentence because he had not committed the crime.

The government's theory to rebut his contention was that his true reason for not pleading guilty to the attempt on Cappozalo was that the Luchese family had denied him permission to do so. To further this inquiry, the government asked Spinelli questions about the Luchese family and his involvement in it. In the jury's presence he refused to answer the questions. The government likewise asked questions about his brother Robert.

Spinelli's argument on appeal is that the government abusively contrived to compel him to claim the privilege in the jury's presence by asking improper questions to which he was expected to claim the privilege. There is no merit to his contention for several reasons. First, all these subjects were proper areas for the government to explore on cross examination. To rebut Spinelli's argument that he did not plead guilty to the attempted murder of Capozzalo because he was innocent, it was proper for the government to cross examine him on the government's competing theory – that the Luchese family denied Spinelli permission to

12

plead guilty. Of necessity, such questions involved inquiry into the Luchese family and his involvement with it. Questions about Spinelli's brother Robert were also proper because Robert, according to the government's evidence, was involved with Spinelli in the attempt on Capozzalo and in activities of the Luchese racketeering enterprise.

Even if some of the government's questions were not within the proper scope of cross examination for purposes of the Fifth Amendment waiver, Spinelli's contention fails. With the agreement of the parties, Judge Dearie had devised a procedure whereby Spinelli could invoke his Fifth Amendment rights without the jury knowing he had done so. If the government posed a question to Spinelli to which Spinelli wished to invoke his Fifth Amendment privilege, Spinelli's counsel would object and the court would consider the issue at the side bar, out of the hearing of the jury. If Spinelli needed to confer with his counsel, the court would allow him to do so. Spinelli, however, did not take advantage of the procedure. He simply refused in the presence of the jury to answer questions. Where the court has devised a procedure to protect the defendant from having the jury learn potentially prejudicial information, and the defendant disregards those protections, the defendant has himself, and not the court, to blame for any prejudice he suffers.

In sum, there is no merit to Spinelli's contention.

**B. Improper Comments on Summation**

Spinelli contends he is entitled to a retrial because on summation the AUSA (1) without evidentiary basis asserted the government's ignorance of crimes committed by Gioia, (2) told the jury that the judge who sentenced Gioia had found his testimony truthful, and (3) vouched personally for the truthfulness of Spinelli and Gioia.

13

As for the for the first contention, Spinelli protests the AUSA's statement, "We didn't know the vast extent of his criminal background." Spinelli argues that this assertion was without support in the record. His contention is without merit. Gioia had testified that, to the best of his knowledge, the Government was not aware of his commission of his crimes until he revealed them.

As for the second allegation – about the judge who sentenced Gioia – Spinelli's argument mischaracterizes the AUSA's remark. The AUSA did not say to the jury that Gioia's sentencing judge found Gioia to be truthful in his testimony. In arguing to the jury that Gioia, having already testified against numerous other defendants and having already received his sentence, had no motive to fabricate accusations against Spinelli, the AUSA said that Gioia had received a light sentence of seven years imprisonment because he cooperated against numerous defendants. The evidence unquestionably showed that Gioia had testified against numerous defendants. This was not the same as telling the jury that Gioia's sentencing judge had found him to be truthful.

Nonetheless, Spinelli is correct that the AUSA would have been better advised not to tell the jurors the sentencing judge's reasons for the sentence. The evidence before the jury did not reveal the sentencing judge's reasons. The judge's reasons, furthermore, were irrelevant to the argument being made, which was that Gioia's interest lay in telling the truth because, if he had lied, his cooperation agreement allowed the government to pursue additional charges against him. Although the judge's reasons would better have been left unsaid, this error had no significant consequence.

14

Spinelli's third allegation raises a more serious problem. During the rebuttal summations, the AUSA said to the jury that not one of the cooperating witnesses "ha[d] ever lied under oath or perjured themselves" or "falsely implicated anybody in a crime." It is improper for a government prosecutor to make such an assertion to the jury.[1] Such a statement, for starters, relies on matter outside the record of evidence presented to the jury. It says to the jury that the prosecutor, as a disinterested and objective officer of the government of the United States, has made a fair and thorough assessment of the witness's truthfulness (or alternatively possesses a special power to distinguish between truth and falsehood), and invites the jury to rely on an assurance furnished by the government of the United States of the witness's honesty. *See United States v. Modica*, 663 F.2d 1173, 1178-79 (2d Cir. 1981). By making these statements, the prosecutor put her own credibility at issue and implied the existence of extraneous proof which would support her assertion about the witnesses' credibility. *See United States v. Drummond*, 481 F.2d 62, 63-64 (2d Cir. 1973); *United States v. Rivera*, 22 F.3d 430, 438 (2d Cir. 1994). Even if the evidentiary record were reopened during summation to permit the receipt of new evidence, the prosecutor would not be competent to certify that a witness has testified honestly, much less that the witness has *never* falsely accused anyone.

The prosecutor is of course entitled to argue forcefully and vigorously to the jury in support of her witness's credibility. But the argument must be based on evidence in the record. For example, as noted above, the AUSA was perfectly entitled to argue to the jury that Gioia's self-interest would lead him to testify truthfully because lies could expose him to further

---

[1] The AUSA representing the government on this appeal was not the trial attorney.

15

prosecution. The AUSA was undoubtedly entitled to rely on the fact that Gioia's testimony concerning Spinelli's admissions corroborated Basciano's description of what Spinelli did to further the attempt on Cappozalo, and vice versa; the AUSA was at liberty to argue that the testimony of each showed that the other was telling the truth. But the prosecutor is not entitled to tell the jurors that they may rely on her own assurances of the witness's truthfulness.

Nor do we agree with the government's defense of the rebuttal summation in its brief to our court. Instead of relying on the harmlessness of the improper remark in the face of the powerful evidence of guilt, the government argues that a prosecutor may vouch personally for the honesty of government witnesses when the defense has the effrontery to argue to the jury that government witnesses have lied. *See* Gov't Brief at 63 (stating that where "defense counsel engaged in persistent attacks on the credibility of the government's witnesses," it was proper for the AUSA to vouch for the honesty of the government witnesses).

It is not misconduct for a defense attorney to argue on the basis of inferences drawn from the evidence (or the witness's demeanor) that a witness for the government has lied. When an accomplice in a criminal venture makes a cooperation agreement with the government and testifies against his prior criminal confederate, there is no impropriety in the defense attorney arguing to the jury that the cooperating witness has falsely accused the defendant in order to get a better deal for himself. Such arguments are made in virtually every case in which an accomplice testifies for the government under a cooperation agreement. They do not justify the prosecutor's telling the jury that the government's witnesses have never "falsely implicated anyone in a crime

16

[or] lied under oath or perjured themselves." [2]

In support of the argument, the government cites *United States v. LaSorsa*, 480 F.2d 522 (2d Cir. 1973), *United States v. Rivera*, 22 F.3d 430 (2d Cir. 1994), and *United States v. Myerson*, 18 F.3d 153 (2d Cir. 1994). These cases do not support the government's argument that a defendant's attack on a government witness's veracity justifies the government prosecutor in vouching for the witness's veracity. These cases deal with the very different circumstance of a defense attorney's gratuitous accusation, without basis in the evidence, that the government *itself* has suborned perjury and framed the defendant. In *LaSorsa*, 480 F.2d at 526, defense counsel had made "open insinuations that the Government had without justification, staged a framed prosecution . . . because it needed to obtain convictions to respond to the public's outcry against narcotics pushers." In *Rivera*, 22 F.3d at 438, defense counsel "repeatedly accused the government of having fabricated [the cooperating witness's] testimony"; and in *Myerson*, 18 F.3d at 163 & n.13, the defendant, summing up *pro se,* accused the prosecutor of having chosen to prosecute him because the defendant was "too uppity. . . being a flamboyant, big, cigar smoking Jewish lawyer " and because the prosecutor "wanted a packed courtroom." In those circumstances, very different from a defendant's conventional evidence-based attack on the credibility of *witnesses*, we have allowed the government some latitude in defending because

---

[2]Even if the defense attorney had made improper arguments, this would not justify the prosecutor's giving the jurors a personal assurance of the truthfulness of the government's witnesses.

17

without it the government would have no way of responding.[3]   Nothing in those cases, however, authorizes a prosecutor to give the jury a personal assurance of the truthfulness of the government's witnesses merely because the defense argued that the evidence supports an inference that the witnesses lied.[4]

An inappropriate remark to the jury "must be examined within the context of the trial to determine whether the prosecutor's behavior amounted to prejudicial error." *See United States v. Young*, 470 U.S. 1, 12 (1985)*; United States v. Friedman*, 909 F.2d 705, 709-10 (2d Cir. 1990). Relevant factors are the severity of the misconduct, the measures adopted to cure the misconduct, and the certainty of conviction absent the misconduct. *Friedman*, 909 F.2d at 709-10; *Modica*, 663 F.2d at 1181.  We conclude that the improper remarks do not justify disturbing the verdict.

---

[3] In *LaSorsa*, for example, the government was permitted to respond that "the jury should acquit if it believed the Government 'framed' the defendants."  480 F.2d at 526.

[4] Our statement in *United States v. Perez*, 144 F.3d 204, 210 (2d Cir. 1998), that "[p]rosecutors have greater leeway in commenting on the credibility of their witnesses when the defense has attacked that credibility" must be understood in the context of the case.  The defense attacked the credibility of the government agents, characterizing them as "a tangled web that has been exposed," effectively accusing the government agents of a "frame-up." *Id.* at 210-11.  On summation, the prosecutor said, "I submit to you that they are reliable, you can trust their testimony.  You can count on them.  And there's some reasons why I say that to you," – whereupon the prosecutor "then discussed particular items of evidence in detail and argued that the evidence supported the officers' credibility." *Id.* at 210.  In commenting on these remarks our court began by asserting that, "Attorney statements vouching for the credibility of witnesses are generally improper because they imply the existence of extraneous proof."  We noted however that the prosecutor's remarks at issue "did not suggest that he had special knowledge of [the] facts not before the jury." *Id.*  In context, the statement about the reliability of the witnesses was an argument supported by the evidence, which did not imply the prosecutor's personal assurance based on something external to the evidence.   It therefore was not "an improper vouching." *Id.* Our comment to the effect that prosecutors have "greater leeway" in no way implied authorization for the vouching in the present case.

*See Young*, 470 U.S. at 12.  They did not play a significant role in the trial.  The evidence of Spinelli's guilt was powerful and well corroborated.  In the face of the evidence, there is no reason to doubt that the verdict would have been the same without the inappropriate remark.[5]

**III. Remand for Sentencing**

As Spinelli notes, we vacated Robert Spinelli's conviction and remanded for re-sentencing because the district court applied a four-level increase for permanent or life-threatening injury to the victim under U.S.S.G. § 2A2.1(b)(1) without making the necessary factual findings.  *United States v. Spinelli*, 352 F.3d 48, 56-57 (2d Cir. 2003).  Spinelli asks that his sentence, for which the district court applied the same four-level increase, be remanded for the same reason.  The Government agrees.

The Government also agrees with Spinelli that the case should be remanded pursuant to *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005), so that the district court can determine whether the sentence would have been materially different if the Supreme Court had already

---

[5]This judge, speaking for himself alone and not for the panel, notes that in thirty years of judging, he has seen numerous instances in major cases in which experienced prosecutors have overreacted to defense arguments and made serious errors in the rebuttal summation, risking mistrial and imperiling their record on appeal.

We appreciate that the moment of rebuttal summation can be dangerously emotional for a prosecutor.  She cannot prepare the rebuttal calmly in advance but must do so under pressure with little time, as she does not know in advance exactly what arguments the defense attorneys will make on their summations. Having labored intensively over a long time to investigate and prepare an important case, the prosecutor may understandably react emotionally to hearing the defense attorneys impugn the testimony of a witness with whom the prosecutor has worked and which testimony the prosecutor genuinely believes to be truthful, and in so doing threaten the acquittal of a malfeasor.

It would seem a useful precaution even for experienced prosecutors before delivering the rebuttal summation to review the arguments they plan to make with an experienced member of their staff who has not been involved in the trial and will therefore give unemotional counsel.

decided *United States v. Booker*, 543 U.S. 220 (2005), at the time.  In light of the Government's concessions, we remand for re-sentencing.

## CONCLUSION

The conviction is AFFIRMED, but the case is REMANDED for reconsideration of the sentence.