**UNITED STATES of America, Appellee,**

v.

**Robert SPINELLI, Defendant–Appellant.**

**Docket No. 99–1448.**

United States Court of Appeals, Second Circuit.

Argued: Oct. 1, 2003.

Decided: Dec. 10, 2003.

**50**

Daniel S. Dorsky, Assistant United States Attorney, for Roslynn R. Mauskopf, United States Attorney, Eastern District of New York (Jo Ann M. Navickas, Assistant United States Attorney, of counsel), for Appellee.

Gail E. Laser, New York, NY, for Defendant–Appellant.

Before: MINER, CALABRESI, and STRAUB, Circuit Judges.

CALABRESI, Circuit Judge.

This case arises out of the brutal 1992 shooting of Patricia Capozzalo ("Capozzalo"), whose brother, Peter Chiodo ("Chiodo"), was a member of the Luchese crime family and was suspected by other members of cooperating with a government investigation. The defendant-appellant, Robert Spinelli ("Spinelli"), is the brother of Michael Spinelli ("Michael"), who served in Chiodo's "crew" and sometimes acted as his bodyguard. Because Spinelli drove a second getaway car for the perpetrators of Capozzalo's shooting, a jury convicted Spinelli of conspiracy to murder in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(5); of assault with a dangerous weapon, in violation of 18 U.S.C. § 1959(a)(3); of conspiracy to tamper with a witness, in violation of 18 U.S.C. § 371; and of witness tampering, in violation of 18 U.S.C. § 1512(a)(1)(A). The district court (Dearie, *J.*) sentenced Spinelli to 120 months' imprisonment, three years of supervised release, and a $200 special assessment.

On appeal, Spinelli argues (1) that the district court erred in denying his motion to sever his trial from that of his brother, who was convicted of the same charges as Spinelli, as well as on two counts of using a firearm during a crime of violence; and (2) that his own sentence was improperly enhanced for committing a crime involving "permanent or life-threatening bodily injury," in light of the fact that the victim sustained only minor physical injuries in the murder attempt. We affirm the judgment of conviction, but vacate and remand for resentencing.

## Background

On May 8, 1991, after his fellow Luchese crime "family" members came to believe (erroneously) that he was cooperating with the government, Peter Chiodo was assaulted and shot thirteen times. "Family" member Richard Pagliarulo ("Pagliarulo"), a member of Chiodo's crew, assigned the shooters and replaced Chiodo as "captain" after the murder attempt. Subsequently, Pagliarulo and an associate warned Chiodo through his attorney that Chiodo's wife would be killed if he cooperated with the government's investigation. They also advised Chiodo's father to warn Chiodo that his whole family would be assassinated if he cooperated. Chiodo nevertheless decided to cooperate with the government. While most of his family was relocated under the Federal Witness Protection Program, his sister Patricia Capozzalo declined to join them. Later, her husband was advised to abandon the job Chiodo had found for him at a warehouse, and the family considered moving as a precaution. But, after some time away, they decided to return to their home.

Four months after the attempt on his life, Chiodo testified against several organized crime members who were on trial for corruption in New York's window replacement industry. Pagliarulo and Michael sent individuals to monitor his testimony, and attempted to unearth information to discredit Chiodo. In early 1992, Chiodo was scheduled to testify in additional trials, including that of Luchese family boss Vittorio "Vic" Amuso ("Amuso"). Around

this time, Pagliarulo asked crew members for Capozzalo's address and physical description. Michael told Dino Basciano ("Basciano"), another crew member, to expect to be asked to kill someone. Pagliarulo later told Basciano that the target was Capozzalo, and that Amuso had approved the hit. Pagliarulo apparently gave Michael the task of selecting the crew members who would carry out the murder, and Michael assigned his brother, Spinelli, to drive a second back-up, or "switch," getaway car. The crew members planned to use walkie-talkies so that Michael could signal Spinelli that the hit had occurred and that they were on their way to his getaway car. Spinelli secured the getaway car, but did not participate in the group's pre-hit surveillance of Capozzalo, or in the procurement of firearms.

The group made two unsuccessful attempts to carry out the hit: in the first, as they approached Capozzalo's car, a girl came out of a nearby house, and Michael radioed Spinelli that the hit was off. The second attempt was also foiled by the arrival on the scene of a potential witness. Then, on March 10, 1992, as Capozzalo returned home from driving her children to school, Michael blocked her car with his van while Basciano walked to the driver's side of Capozzalo's car and fired two shots through the window. The gun's adaptor apparently disintegrated, causing the gun to begin to fall apart. Basciano fired additional shots and then jumped into the van. Though Capozzalo was able to duck under her dashboard, one bullet lodged in her neck and another ricocheted off her back. She was treated at St. Vincent's Medical Center at Richmond, where the bullet was dislodged and she received three sutures for a minor wound behind her ear. Remarkably, tests revealed no internal injuries or other physical harm, and Capozzalo was released after only a couple of days in the hospital.

As Michael and Basciano made their escape, Michael apparently radioed Spinelli that they were on their way to him. They got into Spinelli's getaway car and drove to Michael's house. Spinelli took the guns, walkie-talkies, ski masks, and other items used in the crime to his sister's house and disposed of the switch car. They only learned later that Capozzalo had survived the attack.

Michael and Robert Spinelli were indicted together, and were scheduled to be tried together. Prior to trial, Spinelli made a motion for severance. Michael submitted an affidavit to the court supporting his brother's request. In this statement, Michael swore that he had been advised by counsel that in a joint trial, he should invoke his Fifth Amendment privilege not to testify. If, however, the brothers were tried separately, Michael averred, he would waive the privilege and "testify that Robert Spinelli played no role in connection with the shooting of Patricia Capozzalo." His affidavit concluded, "if the Court grants a severance, and allows me to be tried first, I fully intend to testify on Robert Spinelli's behalf at his trial."

Spinelli also submitted a memorandum of law in support of his motion for severance. He argued that the availability of Michael's exculpatory testimony was conditioned upon separate trials for the two brothers; that Michael's testimony would not be cumulative since the evidence against Spinelli was minimal; that neither trial was expected to last more than one or two weeks, rendering concerns about judicial economy inapposite; and that Michael's testimony would not be subject to substantial impeachment. Spinelli's motion for severance was denied.

At trial, Basciano testified that Pagliarulo had ordered the shooting of Capozzalo, and that Basciano and Michael gathered a

group together to carry out the hit. He added that Jody Calabrese and Gregory Cappello carried weapons and drove the first back-up car. According to Basciano, Michael selected his brother to drive the second back-up, or "switch," car unarmed. Basciano also testified about the numerous violent crimes in which he had participated as a member of the Luchese crime family, including an aborted murder attempt involving Michael, Cappello, and Calabrese.

Capozzalo testified about the events leading up to the shooting, and described the shooting itself. She was unable to identify any of the perpetrators. Dino Marino, a Luchese family associate, testified to Michael's involvement in physical assaults on union officials, and described his own participation in murders and attempting killings. Marino also testified that Spinelli worked at a legitimate construction job.

In exchange for leniency, Luchese family member Frank Gioia testified about prison conversations he had had with the Spinelli brothers while the brothers were incarcerated on unrelated charges. Gioia testified that Michael told him details about the Capozzalo shooting, including the fact that Spinelli was involved. Michael apparently complained to Gioia that, despite Michael's key role in the attempt on Capozzalo's life, he had not been inducted into the Luchese family. The family indicated to Michael through intermediaries that they were interested in inducting him, and also apparently arranged to pay his attorneys' fees to discourage him from cooperating with the government. Michael eventually was inducted into the Luchese family by an underboss while in prison. Spinelli allegedly told Gioia that Michael had been seduced into participating in the Capozzalo hit because of the alluring possibility of joining the Luchese family as a "made" member. Spinelli said that it was this desire on Michael's part that had led to the brothers' involvement in the Capozzalo shooting. Spinelli added that he feared that "eventually we're going to get indicted." Also according to Gioia's testimony, Michael had been given the opportunity to plead guilty to the Capozzalo shooting and receive less jail time, but Luchese bosses convinced him not to include that crime in his plea agreement.

Spinelli called no witnesses in his defense. Michael called two: himself, and Scott Konop. Before Michael testified, Spinelli again moved for a severance. The judge expressed bemusement at this motion, noting that Spinelli's prior motion for severance was premised solely on the necessity from Spinelli's point of view of getting Michael to testify, an event that was now about to occur despite the lack of a severance. The judge again denied Spinelli's motion.

In his testimony, Michael admitted to a variety of criminal activities, including murder, extortion, assaults, and drug dealing, but denied involvement in the Capozzalo shooting. Twice, during cross-examination, he was asked about uncharged acts of murder allegedly committed by Spinelli. When the prosecutor asked Michael whether he had recruited his brother and others to carry out the Capozzalo attack, Michael declined to answer.[1] Scott Konop, who was incarcerated for cocaine trafficking, testified on Michael's behalf that Basciano had confessed to Konop that he and

---

1. Michael was asked, "You recruited Dino Basciano, your good friend, Robert Spinelli, your brother, Jody Calabrese and Gregory Cappello to commit the murder of Patricia Capozzalo with you, correct?" Michael responded, "I refuse to answer that question." Michael also refused to answer questions about the existence of the Luchese crime organization.

a Sal Romano had carried out the Capozzalo shooting.

After less than a day of deliberation, the jury convicted the Spinelli brothers on all counts. The Presentence Investigation Report (PSR) recommended a sentence of between 210 and 262 months for Spinelli, a figure that included a recommended four-level enhancement for a crime involving "permanent or life-threatening bodily injury." The PSR noted that Capozzalo suffers from Post–Traumatic Stress Disorder (PTSD), and that she and her family continue to suffer from the severing of ties to their extended families and the stresses associated with entering the witness protection program and assuming new identities in new locales.[2] In a letter to the district court, Spinelli's counsel countered the four-level enhancement recommendation, arguing that the injuries sustained by Capozzalo warranted only a two-level enhancement for "serious bodily injury."

At Spinelli's sentencing, the district court agreed with the Probation Department that a four-level enhancement was appropriate. On the issue of "whether or not ... the adjustment for permanent or life-threatening injury was correct," the judge stated, "In my view, without hesitation, it was." He continued:

> It would strike me as being peculiar indeed to have this woman shot in the head and shot in the back, who by act of God or some other fortuitous hand did not die, who continues to this day to suffer the consequences of her injuries, to a certain [degree] physically but perhaps even more so emotionally, that this woman did not sustain permanent injury. No doubt in my mind about it.

In a subsequent hearing, Judge Dearie reconsidered the issue but reached the same conclusion. He noted that Spinelli's attorney had made "a persuasive argument that the Second Circuit may agree with; I don't. I think in most cases the injury itself will resolve the problem, the issue. In this case, I don't think so." He went on:

> Here we have an instance, a very unusual case ... where a woman is shot at point-blank range, once in the back, once in the head. And admittedly, neither one of those bullets by itself does any serious damage to the woman's body, much less itself pose a serious risk to

**2.** The PSR stated, under the heading "Victim Impact," the following, *inter alia:* "Mrs. Capozzallo [sic] stated [in a phone interview] that, in general, her life has been completely devastated since the attempt on her life. She informed that although she did not physically die, in many ways, the attempt on her life killed her emotionally and psychologically. For example, she indicated that she is a shadow of her former, happy and personable self. She is now riddled with a constant state of anxiety for which she receives regular psychotherapy and medication. This anxiety stems from Post–Traumatic Stress Disorder, which also causes her to be hyper[-]vigilant and untrusting of others. Mrs. Capozzalo also indicated that she experiences regular, vivid nightmares in which she is being chased and which cause her to wake up in a cold sweat. In addition, she stated that, at times, she finds herself crying uncontrollably for prolonged periods of time .... Mrs. Capozallo informed that the attempt on her life, as well as the relocation into federal protection, have placed severe stress on her family life.... [A]s a result of being under federal protection, they are daily reminded of the instant offense and as a result lead only a semblance of a normal life.... [S]he has no contact with her extended family .... She likened the separation to losing her entire family in an instant, describing the loss as a death that she will never be allowed to grieve.... She stated that she feels raped and will probably never fully recover until her life returns to normal. As long as she is under federal protection, she indicated that the specter of being shot will constantly follow her." The PSR was ordered sealed, presumably to avoid divulging information as to Capozzalo's whereabouts. We hereby unseal only what is essential to this opinion.

her life, that is to say the result of the action taken.

But the definition, curiously ... reads "permanent or life-threatening bodily injury means injury ... involving a substantial risk of death," as opposed [to] resulting in a substantial risk of death.

If someone is shot point-blank by an automatic weapon that fortunately for her broke apart, and by dint of circumstances, call it act of God or the hand of God, as it may well have been, is spared any serious physical injury in one sense, I think that that injury involved a substantial risk of death....

I must say if we're going to read this definition in a manner that is literal and limited to the injury in fact definition ... which works in most cases, I would say this. It would be an absurd result ... although I'm never one for leaping at opportunities to upwardly depart, that what I couldn't do directly, if indeed that was the definition, should be done indirectly, because why should Michael and Robert Spinelli in effect reap the harvest of the hand of God, to use the metaphor that's being used here?

At the sentencing hearing, Spinelli's counsel attempted to depict the defendant as a victim of his brother's criminal scheming, who was led astray by his admiration for Michael and was vulnerable to evil influences in part because of his low I.Q. (63). The government responded that Spinelli had earned a high school equivalency diploma while in prison (belying low intelligence), that he had been involved in other criminal activity (including a marijuana conspiracy and a series of robberies of elderly individuals), and that he had sought to gain from Michael's elevation to the status of a "made" member of the Luchese family. Spinelli's attorney also argued that Spinelli had no knowledge of the specifics of the plot to murder Capoz-

zalo; rather, she contended, he was brought in to drive the switch car at the last minute. Finally, she argued that Spinelli's family circumstances—he has two sons, then aged 8 and 9, whose mother was unavailable to care for them—should work in favor of a lesser sentence.

Taking these factors into account, Judge Dearie characterized Spinelli's role in the Capozzalo attempted murder as relatively minor, warranting a role adjustment. Because of his lesser level of culpability, and given his low I.Q. and his relationship with his older brother, the judge downwardly departed further, and imposed a sentence of 120 months imprisonment, three years of supervised release, and a $200 special assessment.

## Discussion

### A. Motions for Severance

■ As written at the time of Spinelli's sentencing, Federal Rule of Criminal Procedure 14 permitted a district court to "grant a severance of defendants" if "it appear[ed] that a defendant ... [was] prejudiced by a joinder ... of defendants ... for trial together." Fed.R.Crim.P. 14 (1999). The decision to grant or deny severance is "committed to the sound discretion of the trial judge." *United States v. Blount*, 291 F.3d 201, 209 (2d Cir.2002) (internal quotation marks omitted). In order to overturn a district court's denial of a severance motion, we must conclude that the joint trial resulted in "substantial prejudice" to the appellant. *See United States v. Stirling*, 571 F.2d 708, 733 (2d Cir.1978). Indeed, such decisions can be reversed "only if a defendant can show prejudice so severe that his conviction constituted a miscarriage of justice and that the denial of his motion constituted an abuse of discretion." *United States v. Diaz*, 176 F.3d 52, 102 (2d Cir.1999) (internal quotation marks omitted). It is not enough to dem-

onstrate that separate trials would have increased the chances of the appellant's acquittal, *see United States v. Burke*, 700 F.2d 70, 83 (2d Cir.1983); rather, the appellant "must show prejudice so severe as to amount to a denial of a constitutionally fair trial," *United States v. Serpoosh*, 919 F.2d 835, 837 (2d Cir.1990).

■ Considerations of efficiency and consistency militate in favor of trying jointly defendants who were indicted together, as the Spinelli brothers were. *See United States v. Feyrer*, 333 F.3d 110, 114 (2d Cir.2003) (citing *Zafiro v. United States*, 506 U.S. 534, 537, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993)). Joint trials are often particularly appropriate in circumstances where the defendants are charged with participating in the same criminal conspiracy, as is the case here. *Cf. United States v. Salameh*, 152 F.3d 88, 115–16 (2d Cir.1998) (per curiam) (noting that spillover prejudice is unlikely in cases where defendants are charged in same conspiracy).

■ Spinelli argues that the joint trial with his brother resulted in substantial prejudice, (1) because testimony from prosecution witnesses related in graphic detail Michael Spinelli's violent and murderous criminal history, a history Robert Spinelli does not share; (2) because the evidence against Spinelli himself was less than overwhelming, especially when compared to the voluminous proof of Michael's guilt; (3) because Michael's testimony on his own behalf reinforced the perfidy of Michael's crimes, did not refute Spinelli's

role in the Capozzalo shooting, and exposed the jury to evidence—which would not have been admissible at a separate trial—about Spinelli's involvement in other violent acts; and (4) because the jury heard Frank Gioia's testimony that Michael told him that Spinelli was involved in the crime and this evidence would not have been admissible had Spinelli been tried alone.

■ The defendant's arguments are, however, unavailing. "[D]iffering levels of culpability and proof are inevitable in any multi-defendant trial and, standing alone, are insufficient grounds for separate trials." *United States v. Carson*, 702 F.2d 351, 366–67 (2d Cir.1983). Even "joint trials involving defendants who are only marginally involved alongside those heavily involved are constitutionally permissible." *United States v. Locascio*, 6 F.3d 924, 947 (2d Cir.1993). There are, of course, cases in which the sheer volume and magnitude of the evidence against one defendant so dwarfs the proof presented against his co-defendant that a severance is required to prevent unacceptable spillover prejudice. But the case before us is not such a case. This is especially so since the district court explicitly instructed the jury to consider the defendants individually.[3] *See United States v. Miller*, 116 F.3d 641, 679 (2d Cir.1997) (noting that spillover prejudice may be remedied through clear judicial instructions).

■ As the government points out, much of the evidence about Michael's

---

[3]. The judge instructed: "As you know, two defendants are on trial in this case. You must consider the case against each defendant separately. In effect, two separate trials have taken place before you. I have told you that before." He continued, "It is your duty to give separate individualized consideration to the case of each defendant," and reminded the jurors that they had to "consider each

count of the indictment and each defendant charged in that count separately and ... return a separate verdict on each defendant for each count in which he [was] charged." The court added that "mere association with one or more members of the conspiracy does not automatically make a defendant a member. A person may know or be friendly with a criminal without being a criminal himself."

crimes would have been admissible at a separate trial of Spinelli, since it was relevant to proving the nature and scope of the conspiracy in which both were, to differing degrees, involved. Moreover, even "the fact that evidence may be admissible against one defendant but not another does not necessarily require a severance." *Carson*, 702 F.2d at 367. Here, the defendant has not shown that otherwise inadmissible evidence about his brother's crimes, or the questions briefly raised about his own prior criminal activities, resulted in substantial prejudice.[4]

Finally, the defendant argues that his brother's refusal to answer questions about Spinelli's involvement in the shooting was prejudicial to Spinelli's case. The appellant's original motion for severance similarly was premised upon Michael's likely invocation of Fifth Amendment privilege and his resulting inability to offer (presumably exculpatory) testimony on Spinelli's behalf. Michael had offered to testify to Spinelli's innocence, but only if Spinelli were tried separately and subsequently. We have, however, noted that such conditional offers "smack[ ] of bad faith." *United States v. Bari*, 750 F.2d 1169, 1177 (2d Cir.1984). And we are not convinced that Michael was significantly hampered in testifying for Spinelli, had he wished to do so, by the lack of a severance.

All in all, we cannot say that the district court abused its discretion in denying the defendant's motions for severance.

## B. Enhancement for "Permanent or Life–Threatening Bodily Injury"

The Sentencing Guideline applicable to crimes involving attempted murder provides for a four-level enhancement if the "victim sustained permanent or life-threatening bodily injury," and a two-level enhancement "if the victim sustained serious bodily injury." U.S.S.G. § 2A2.1(b)(1). Definitions for those terms are found in the Commentary to § 1B1.1. The Commentary defines "permanent or life-threatening bodily injury" as "injury involving a substantial risk of death; loss or substantial impairment of the function of a bodily member, organ, or mental faculty that is likely to be permanent . . . ." It further specifies that "[i]n the case of a kidnapping, for example, maltreatment to a life-threatening degree (*e.g.*, by denial of food or medical care) would constitute life-threatening bodily injury." U.S.S.G. § 1B1.1, cmt. n.1(h) (1999). The Commentary defines "serious bodily injury" as an "injury involving extreme physical pain or the protracted impairment of a function of a bodily member, organ, or mental faculty; or requiring medical intervention such as surgery, hospitalization, or physical rehabilitation. . . ." U.S.S.G. § 1B1.1, cmt. n.1(j) (1999). We review the district court's factual findings for clear error, and its interpretation of the Guidelines *de novo*. See *United States v. Maaraki*, 328 F.3d 73, 75 (2d Cir.2003) (per curiam).

The district court offered alternative theories in support of its application of a

---

4. The defendant also argues that Gioia's testimony that Michael told him that Spinelli was involved in the shooting would not have been admissible had Spinelli been tried alone. Spinelli says that Michael's statement was properly admitted against Michael under Fed.R.Evid. 801(d)(2) because it was his own statement, but would not be admissible against Spinelli. It does not appear, however, that Spinelli objected to this testimony or asked for an instruction for the jury not to consider this evidence against him. In addition, even if Spinelli had been tried alone, the testimony might have been admissible under Fed.R.Evid. 804(b)(3) (statement against interest), or possibly under Fed.R.Evid. 801(d)(2)(E) (statement by a co-conspirator). In any event, the defendant has not shown substantial prejudice.

four-level enhancement. In his initial consideration of the PSR recommendation, Judge Dearie emphasized the permanent nature of Capozzalo's emotional injury. Upon reconsideration, the judge also referred to the life-threatening circumstances to which Capozzalo was subjected, and emphasized the sheer good fortune that had prevented her death. The government argues that the district court's imposition of the four-level enhancement was appropriate under either of these rationales. The defendant, instead, contends that because the victim escaped with minor physical injuries of a temporary nature, only a two-level enhancement for "serious bodily injury" is appropriate.

We agree with the defendant that the sentencing enhancements apply to the results of a crime, rather than to the circumstances of its commission. In remanding for resentencing, however, we emphasize that emotional injury can result in "loss or substantial impairment of the function of a ... mental faculty" that is sufficient to warrant a four-level enhancement. The issue before the district court, on remand, is whether Capozzalo suffered such a loss or impairment.

### A.

The threshold question presented by this case is whether the sentencing enhancements at issue should depend solely upon the *results* of the criminal act, or, alternatively, at least in some extreme and unusual situations, can reflect the defendant's conduct, the circumstances surrounding the crime, or the nature of the crime attempted. At least two circuits that have considered this question have unequivocally held that the resulting injury to the victim is the sole determinant of whether these enhancements are justified. *See United States v. Dodson,* 109 F.3d 486, 489 (8th Cir.1997) ("It is not the defendant's conduct ... which determines whether a victim has sustained bodily injury; rather, the resultant physical injury is the determining factor."); *United States v. Perkins,* 89 F.3d 303, 308 (6th Cir.1996) ("[T]he enhancement for causing 'bodily injury' is premised upon a particular result, not the defendant's conduct. It penalizes the defendant based on the severity of the outcome....").[5]

We believe that these circuits have correctly interpreted the Guidelines. Since, for example, attempted murders are, by definition, life-threatening, to consider the defendant's conduct or the intended result of his actions could subject every attempted murder to the four-level enhancement, regardless of the injuries actually suffered by the victim. But the Guidelines clearly contemplate various levels of enhancement for attempted murder—or indeed no enhancement at all. It follows that a focus

---

5. The Ninth Circuit took a somewhat different approach in *United States v. Morgan,* 238 F.3d 1180, 1188–89 (9th Cir.2001), suggesting that the life-threatening circumstances surrounding a crime might warrant the enhancement for "permanent or life-threatening bodily injury" even if the physical injuries resulting from the maltreatment were not themselves life-threatening or permanent. Notably, however, that case involved a carjacking where the victim was thrown into a car trunk, beaten repeatedly over the head with a metal pipe, and left for dead outdoors in bitterly cold weather. While the victim, miraculously, did not suffer permanent or life-threatening injuries, that crime bore considerable resemblance to the kidnapping example described in the Guideline Commentary. In contrast, the crime here, while committed with the most brutal and fatal of intentions, did not inflict the sort of punishing physical abuse described in the commentary's kidnapping example and perpetrated in the *Morgan* case. For an application of a sentencing enhancement for "permanent or life-threatening bodily injury" in a factual situation similar to that in *Morgan,* see *United States v. Williams,* 258 F.3d 669, 673–74 (7th Cir.2001).

on results is virtually compelled by the Guidelines' structure.

Finally, neither the language of the Guidelines nor of the Commentary suggests that the defendant's conduct or the circumstances surrounding the crime are relevant to the enhancements' applicability. Of course, the defendant's intentions and actions are not off limits to judges making sentencing decisions. Indeed, other provisions of the Guidelines expressly allow for adjustments based on these factors. *See, e.g.*, U.S.S.G. § 3A1.1 (enhancement for hate crime motivation); § 3A1.4 (enhancement for "a felony that . . . was intended to promote[ ] a federal crime of terrorism"); § 3B1.3 (enhancement for defendants who "abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense"). But the particular sentencing enhancements before us are differently written and are, on their face, made clearly dependent on the resulting injuries to the victim.

### B.

The second important question raised by this case concerns whether and to what extent the enhancement for "permanent or life-threatening bodily injury" applies to crimes in which the victim has suffered only emotional injury. In sentencing Spinelli, Judge Dearie emphasized the permanence of the emotional harm that the defendant's crime had inflicted on Capozzalo. The defense argues that even if an enhancement for "serious bodily injury" may properly encompass the emotional wounds suffered by a victim like Capozzalo, a four-level enhancement requires a showing that the victim's mental faculties were impaired as a result of the crime.

The emotional agony suffered by victims of violent crime eludes precise measurement and often defies description. There is no question that emotional or psychological injuries can be "permanent or life-threatening," and that they may, in some instances, cause the "loss or substantial impairment of the function of a . . . mental faculty." Courts that have considered the applicability of the "permanent or life-threatening" and "serious" "bodily injury" sentencing enhancements to emotional or psychological injuries have interpreted "bodily injury" to include harm to a victim's mental processes and psychic well-being. Any suggestion, then, that this sentencing enhancement applies only in cases of corporeally manifest physical injury is untenable. *Cf. United States v. Jacobs*, 167 F.3d 792, 801 (3d Cir.1999) (noting that Guidelines treat physical and non-physical injuries with comparable seriousness); *see also United States v. Rodgers*, 122 F.3d 1129, 1132–33 (8th Cir.1997) (holding that while PTSD may not always rise to the level of "serious bodily injury," it can do so in some circumstances).[6]

Since virtually every murder attempt is likely to inflict some psychological damage upon its victim, it is not surprising that the Guidelines draw distinctions between various degrees of psychic harm. Thus, the two-level enhancement for "serious bodily injury" automatically becomes applicable in cases where "medical intervention" is required, and this remains so when the

---

**6.** Some courts faced with the question of whether psychological injury can constitute "bodily injury" for the purposes of the sentencing enhancement for "serious bodily injury" have declined to decide the issue. *See, e.g., United States v. Sawyer*, 115 F.3d 857, 860 n. 2 (11th Cir.1997) (finding no "bodily injury" in the instant case, but declining to decide the question more generally); *United States v. Lanzi*, 933 F.2d 824, 827 (10th Cir. 1991) (same).

necessary intervention is the result of psychic damage only. But, under the Commentary, the four-level enhancement for "permanent or life-threatening bodily injury" makes "substantial impairment of the function of a . . . mental faculty" a prerequisite in cases involving emotional or psychological rather than physical injury.

 Precedents from other circuits, however, correctly suggest that severe PTSD and its psychological manifestations may constitute an "impairment of the function of a . . . mental faculty" in certain circumstances. Defendants prosecuted under the federal carjacking statute, *see* 18 U.S.C. §§ 2119(2) & 1365(g)(3) (1999) (referring to 18 U.S.C. § 2119(2)), for example, have been subjected to a sentencing enhancement for "serious bodily injury," which was defined in part as the "protracted loss or impairment of the function of a mental faculty," when their victims have suffered from lasting psychological debilitation. *See, e.g., United States v. Lowe*, 145 F.3d 45, 53 (1st Cir.1998) (holding that persistent psychological trauma from rape during carjacking constituted "protracted impairment of mental faculties"). And, in upholding the application of the "permanent or life-threatening bodily injury" enhancement, courts have also considered the permanence of psychological damage caused by the criminal act. *See, e.g., United States v. James*, 957 F.2d 679, 681 (9th Cir.1992) (affirming enhancement for a defendant who infected a nine-year-old child with genital herpes, in part because the permanent and recurring nature of disease served as a constant reminder of sexual assaults, thereby lessening the likelihood that the victim would overcome her psychological trauma). Indeed, under the language of the Guideline, the four-level enhancement applies only if there is loss or impairment of the function of a mental faculty that is "likely to be permanent." It

is clear, then, that the "impairment of a . . . mental faculty" category is capacious enough to encompass lasting emotional and psychological harm, at least when that harm is aggravated by circumstances that prolong its detrimental impact on the victim.

On the facts before us it seems possible that the shooting of Patricia Capozzalo may have led to lasting psychological and emotional effects sufficiently severe to constitute "loss or substantial impairment of a . . . mental faculty that is likely to be permanent," thereby warranting a four-level enhancement. As we stated earlier, the sentencing enhancements at issue are directed at the injurious *results* of a defendant's crime, not his conduct. Given that, in applying this enhancement, we look not to intentions or circumstances, but to outcomes, defendants must take the bitter with the sweet. Thus if Spinelli can benefit from Capozzalo's miraculous avoidance of serious physical injury despite the fact that she was shot several times at point-blank range, Spinelli cannot avoid the psychological repercussions that have arisen from the shooting itself, and from Capozzalo's being forced to enter a witness protection program after the shooting. If the necessity of relinquishing her identity, relocating to a new and unfamiliar place, uprooting her immediate family, and involuntarily estranging herself from her extended family has caused Capozzalo to suffer from prolonged emotional and psychological trauma that substantially impairs the functioning of her mind, Spinelli's sentence can reflect that result of his criminal actions even if other victims would not have suffered such severe mental harm. Just as her remarkable escape from death or maiming was beyond the defendant's control yet was germane to the enhancement's applicability, so too are these unusual, but nonetheless real, circumstances of the crime's aftermath.

The district court, in deciding that Capozzalo sustained a permanent injury, found that Capozzalo continued to suffer emotionally from the crime. We do not believe, however, that the district court has yet made factual findings sufficient to establish impairment of a mental faculty.[7] This may be due to the court's reliance on other grounds (which we have rejected) for the enhancement. Under the circumstances, we deem it wise to remand for further inquiry into Capozzalo's psychological and emotional injuries. In so doing, we note that both the government and the defendant should be afforded an opportunity to present evidence as to the nature, severity, and likely duration of those injuries, and to offer arguments for and against construing them as impairments of a mental faculty.[8]

### Conclusion

We conclude that the defendant's joint trial with his brother and co-conspirator did not result in such prejudice as to warrant a reversal of the district court's denial of defendant's motion for a severance. Accordingly, we AFFIRM that denial. We further hold that the district court erred in relying on the circumstances of the crime rather than on its effects in imposing a four-level enhancement pursuant to U.S.S.G. § 2A2.1(b)(1). And, although we also hold that the four-level sentencing enhancement for crimes involving "permanent or life-threatening bodily injury," as defined by the Commentary to U.S.S.G. § 1B1.1, covers certain emotional and psychological injuries, we deem the findings currently before us insufficient to permit us to conclude that the victim in this case suffers from the "loss or substantial impairment of a . . . mental faculty" as required by the Guideline Commentary. We therefore VACATE the appellant's sentence and REMAND for resentencing consistent with this opinion.

---

**7.** In *United States v. Rivera*, 83 F.3d 542, 548 (1st Cir.1996), the court found that a victim's statement to a probation officer that a carjacking and rape "ha[d] had a devastating effect on her life, family, and consensual relationship" was a "generalit[y]" that, when combined with a lack of evidence that she sought professional help, "f[e]ll short of proof measuring up to 'protracted . . . impairment of . . . mental faculty' sufficient to justify an additional ten-year sentence" under the carjacking statute's definition of "serious bodily injury." On remand, the trial court resentenced the defendant, applying the enhancement after finding "protracted impairment of mental facult[ies]" based upon new evidence of the nature, severity, and longevity of the victim's post-traumatic stress. The First Circuit affirmed. *See United States v. Vazquez–Rivera*, 135 F.3d 172, 177–78 (1st Cir.1998).

**8.** We also note that the district court downwardly departed to a significant degree in order to arrive at the sentence it imposed on Spinelli. If, on remand, the distinguished and experienced court finds insufficient evidence to support the enhancement for "permanent or life-threatening bodily injury," it may choose to deduct the additional time from the defendant's sentence, or it may, within the bounds of its discretion under the Guidelines, instead readjust other elements of the defendant's sentence to arrive at what it believes to be a just sentence.